UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMEN AVOYAN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | Case No. 2:24-cv-00434-HDV-JC<br><br>**TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

1

## I.    INTRODUCTION

On December 11, 2020, Plaintiff Armen Avoyan and United States Postal Service ("USPS") employee Azad Hovhannesian were involved in a car accident.  The accident occurred as both drivers intended to turn right from Brand Boulevard onto Lexington Drive in Glendale, California, with Plaintiff's Ford Fusion to the right of Hovhanessian's USPS truck in an extra-wide right lane.  Plaintiff experienced neck and back pain following the accident.

Plaintiff, who alleged negligence, proceeded to trial on September 30, 2025.  After reviewing and weighing all of the evidence, the Court finds that both parties are equally at fault for the accident.  Plaintiff should not have positioned himself to the right of a truck that had its right turn blinker on.  But Hovhannesian should have seen Plaintiff's car before he started moving his truck.  And it was the USPS truck that collided with Plaintiff's Ford Fusion.  The Court also finds that some, but not all, of Plaintiff's medical care was reasonably necessary as a result of this accident.  The Court awards Plaintiff $12,155.19 in damages.

## II.    PROCEDURAL BACKGROUND

Plaintiff initiated this action on January 17, 2024, against Hovhannesian, USPS, the United States of America, and various Doe defendants.[1]  Complaint [Dkt. 1].  Plaintiffs asserted a single claim for negligence under the Federal Tort Claims Act ("FTCA").  *Id.* ¶¶ 9–15.  Hovhannesian and USPS were dismissed by stipulation.  [Dkt. 14].

The Court held a bench trial, which began on September 30, 2025 and ended on October 2, 2025.  [Dkts. 62–64].  Plaintiff rested his case in chief on the second day of trial.  *See* [Dkt. 63]; Trial Transcript ("Tr.") [Dkts. 69, 70, 79] at 283:18–285:25.  Defendants rested their case on the third day.  *See* [Dkt. 64].  The Court ordered the parties to file closing briefs.  [Dkts. 60, 64].  Upon the parties' joint stipulation, the initial closing briefs were to be filed simultaneously on January 15, 2025, and responsive closing briefs were to be filed simultaneously on January 25, 2026.  [Dkt. 73].

---

[1] Does 1 through 50 have not been identified and have not appeared.  Pursuant to the parties' Joint Proposed Final Pretrial Conference Order, [Dkt. 56], they are now dismissed with prejudice.

2

## III.   LEGAL STANDARD

In a bench trial, the judge acts as the fact-finder—weighing the evidence, determining witness credibility, and deciding questions of fact as well as issues of law.  Rutter Group Prac. Guide, Fed. Civ. Trials & Ev. ¶ 17:30 (June 2025); *see also Stillaguamish Tribe of Indians v. Washington*, 102 F.4th 955, 961–62 (9th Cir. 2024) ("The district court's task . . . was to evaluate all the . . . evidence . . . .").  "[T]he court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a).  These findings must be "sufficiently comprehensive and pertinent to the issues" to "indicate the factual basis for the [trial court's] ultimate conclusions."  *Simeonoff v. Hiner*, 249 F.3d 883, 891 (9th Cir. 2001) (citation omitted).[2]

## IV.   LIABILITY

### A.  Trial Testimony

Hovhannesian testified that, on December 11, 2020, at approximately 5 p.m., he drove his USPS truck "northbound [on] Brand Boulevard" in "the lane that's … [on] the curbside" and prepared to "mak[e] a right turn … [on]to Lexington Drive [as] a part of [his] regular route" which he drove "five days a week" for "[m]any years."  Tr. at 52:6–10, 59:11–14, 60:8–14, 78:12–15.  As he "g[ot] closer to the intersection, [the] cars slowed down in front of [him] and … stopped," so he also slowed down and came to a full stop.  *Id.* at 78:16–21; 78:22–24.  He made sure he "had [his] right turn signal light on, look[ed] at [the USPS truck's] mirrors and wait[ed] [for] … the cars [ahead of him] … to move."  *Id.* at 78:25–79:4. 3.  The five mirrors the USPS driver checked gave him a wholly unobstructed view of everything to the right side of his truck, without any blind spots.  *Id.* at 72:2–4, 15–17; 73:17–74:1; 76:25–77:4; 72:15–17, 74:15–18, 75:7–9, 76:13–18; Exs. 1104, 1105,

[2] The Court has elected to issue its decision in narrative form because a narrative form more fully explains the reasons for the Court's decision.  Any finding of fact deemed to be a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law deemed to be a finding of fact is hereby adopted as a finding of fact.

3

1106, 1107. "[A]t that point, [he] did not see any vehicles to [his] immediate right …." Tr. at 79:5–7. "[A]s soon as [the cars] – start[ed] to move, [the USPS driver] checked [his] mirrors again" and made sure he still had his right turn signal light on. *Id.* at 79:8–21. He then slowly approached "the curb so [he] could make a right turn." *Id.* at 64:16–18; 79:8–9, 15–21. "[B]etween the time [he] turned on [his] right turn signal and the time when the impact occurred" the USPS driver "check[ed] his mirrors] . . . [a]t least two, three times." *Id.* at 80:4–11. He never saw any "vehicles on [the USPS truck's] right-hand side." *Id.* at 76:25–77:4; 80:4–8, 12–15. His phone "was in the . . . side of [his] belt in the pocket," and the USPS truck has "no electronics"– not even a "radio [or] navigation" system. *Id.* at 82:9–14; 82:4–7.

Plaintiff testified that he was driving along "Brand Boulevard towards Lexington to go to Eagle Rock" to complete a food delivery. Tr. at 232:18–19; 235:4–6; 269:23–270:1. Plaintiff admits that "[w]hen [he] arrived [at the Brand-Lexington intersection], the [USPS] truck was already there" and he saw it waiting at the light. *Id.* at 232:18–20; 270:11–13; *see also id.* at 234:12–15. Plaintiff testified that the USPS truck did not have its turn signal on. *Id.* at 234:15–23. Plaintiff pulled alongside the USPS truck, "position[ing his] vehicle next to it on the right side." *Id.* at 235:12–16. Plaintiff remained stopped and waiting for the light to change from red to green for "[a]round 15 seconds." *Id.* at 232:21–22; 235:17–19. But Plaintiff never looked back towards the USPS truck he had pulled up alongside—instead, he first "looked to the right" and then merely "look[ed straight] ahead" at the red light. *Id.* at 271:24–272:2, 16–20. "As soon as the light turned green, [the USPS truck began to] move[] and the impact happened." *Id.* at 271:11–13.

Ian Miller, who has a master's degree in mechanical engineering, testified as the United States' accident reconstruction expert. Tr. at 287:8–291:3. He reviewed "photographs, property damage estimates, deposition testimony, a Traffic Collision Report, [and] conduct[ed] inspections . . . of the [accident] site and [the USPS] vehicle[]." *Id.* at 291:7–17. He made a 3D laser scan of both the intersection and the USPS vehicle. *Id.* at 292:1–22, 296:24–297:14, 299:15–21. Miller was unable to inspect Plaintiff's car because Plaintiff disposed of it before filing suit, but he gathered information on it from Carfax, the California D.M.V. database, and the "Expert Auto Stats" database. *Id.* at 297:15–25, 298:22–299:8. Miller analyzed all the available physical data, used

4

accident reconstruction software to simulate the accident, and compared the relevant data to the NHTSA CISS databases, which "collects data from real-life crashes." *Id.* at 300:10–24, 305:21–306:3. Miller concluded that the contact between Plaintiff's vehicle and the USPS vehicle in this case was a "long-duration, same-direction sideswipe." *Id.* at 303:10–304:3; 304:12–305:13 (explaining technical meaning of long-duration, same-direction, and sideswipe). Miller concluded that at the point of contact, Plaintiff's car was "stopped or moving slowly" and the USPS truck was traveling about 7 miles per hour, and that the "delta-v experienced by [Plaintiff's] Ford Fusion . . . [was] 2 miles per hour or less in the first 180 milliseconds of contact." *Id.* at 303:16–18, 312:8–23. Furthermore, he determined that Plaintiff's "Ford Fusion moved laterally . . . left to right . . . on the order of less than a foot as a result of the impact." *Id.* at 302:14–19.

### B. Credibility and Weight

The exact manner in which the December 11, 2020 accident at the heart of this case unfolded is hotly disputed. The Court has only Plaintiff's and Hovhannesian's testimony on this point, which in some instances is flatly contradictory. There was no video from a dashboard or surveillance camera and no other eyewitness testimony presented at trial. Many factual findings thus depend on which party the Court finds more credible.

The Court finds Hovhannesian to be a more credible fact witness than Plaintiff. First, Hovhannesian has less of an interest in this case and thus less motive to "slant, unconsciously or otherwise, his testimony." *United States v. Abel*, 469 U.S. 45, 52 (1984); *see also United States v. Hankey*, 203 F.3d 1160, 1171 (9th Cir. 2000). Plaintiff is a party, with a financial stake in the outcome of the trial. Hovhannesian is not.[3]

Second, Plaintiff was less than forthcoming with respect to other occasions in which he had been in car accidents and made claims. For example, when questioned about earlier car accidents he

---

[3] The Court recognizes, of course, that Hovhannesian is not completely without incentive to slant his testimony, as he may desire to avoid adverse employment consequences with respect to his job as a USPS driver. But this is a less direct and less significant stake in the outcome of trial, and Plaintiff elicited no testimony from Hovhannesian or anyone else regarding employment consequences when USPS drivers are found at fault in motor vehicle accidents.

5

had been in, Plaintiff did not mention any accident on February 10, 2020. *See* Tr. at 254:4–9, 260:11–13.[4] When asked about that accident on cross-examination, Plaintiff initially denied it. *Id.* at 260:17–20. When confronted with a letter from State Farm to Plaintiff dated February 11, 2020, referring to a claim with a date of loss of February 10, 2020, and an affidavit signed by Plaintiff regarding the same claim number and loss on February 10, 2020, Plaintiff maintained that he did not remember or understand these documents and did not remember that incident. *Id.* at 260:25–263:13. Even on re-direct, Plaintiff did not clearly explain the February 10, 2020 accident or his previous failure to disclose it. *See id.* at 281:5–282:2. Plaintiff testified that he "just remembered" the incident, which he described as one in which he was sitting in the back seat of his friend's Mercedes when it was rear-ended. *Id.* But it appears that Plaintiff may have been describing a previous incident from December 2019, not the February 2020 one. *Compare id.* at 280:18–24 (December 2019 accident involved a Mercedes-Benz) *with id.* at 261:11–263:13 (February 2020 accident involved a 2015 Ford Fusion). This inconsistency and lack of candor regarding the February 10, 2020 accident cuts against Plaintiff's credibility.

The Court also observed Plaintiff's and Hovhannesian's demeanor and body language while testifying, and concludes that these factors support the Court's credibility determination.

The Court finds the United States' accident reconstruction expert, Miller, to be credible and forthright with reasonable and supported conclusions. Plaintiff did not present a competing accident reconstruction expert, and Plaintiff's attacks on Miller's methodology are not convincing.[5]

---

[4] Plaintiff was also impeached with respect to a December 15, 2019 accident. While Plaintiff did not deny this accident, he testified that he did not claim any injuries from it. Tr. at 254:14–255:11. But defense counsel showed Plaintiff a letter addressed to him from State Farm Mutual Automobile Insurance Company Claim Specialist Jessie Karidas "deny[ing] [his] injury claim" "regarding the accident of December 15, 2019." *Id.* at 255:24–257:8.

[5] Plaintiff argues that the extent of physical damage to Plaintiff's Ford Fusion and the "boom" sound that Hovhannesian heard upon impact are inconsistent with Miller's conclusion that the impact had a delta-v of 2 mph. Plaintiff's Opening Post-Trial Brief [Dkt. 74] at 8–10. But Miller persuasively explained that there is no way to correlate the "dollar value of damage" or the "noise of an impact" to severity or speed change. Tr. at 325:3–12, 332:19–333:14, 340:23–341:17. Plaintiff also faults Miller for not inspecting the Ford Fusion or either vehicle's event data recorder, and for basing his

6

**C. Findings of Fact**

The motor vehicle accident at the heart of this case occurred on December 11, 2020 around 5:22 p.m. Tr. at 57:8–19; Ex. 3. It was "getting kind of dark." Tr. at 57:8–14; 237:2–4; 258:6–9.[6]

The accident occurred at the intersection of Brand Boulevard and Lexington Drive in Glendale, California. Tr. at 57:8–19; Ex. 3. An aerial view of that intersection, indicating the widths of the various lanes, is depicted below:



analysis on potentially faulty assumptions. Plaintiff's Opening Post-Trial Brief at 9. But Plaintiff disposed of his vehicle before filing suit, and the postal truck did not have an event data recorder. Tr. at 297:15–25, 323:7–11. And Miller credibly testified that his assumptions were "bas[ed] . . . on the physical evidence that's observed" where possible and "on peer-reviewed scientific literature" otherwise. *Id.* at 341:18–342:4.

[6] *See also* ASTRONOMICAL APPLICATIONS DEP'T OF THE U.S. NAVAL OBSERVATORY, TABLE OF SUNRISE/SUNSET, MOONRISE/MOONSET, OR TWILIGHT TIMES FOR AN ENTIRE YEAR (2020), https://aa.usno.navy.mil/calculated/rstt/year?ID=AA&year=2020&task=0&lat=34.1517&lon=-118.2549&label=&tz=8.00&tz_sign=-1&submit=Get+Data (US Navy data indicating that the sun set at that intersection at 4:44 p.m. on Dec. 11, 2020).

7

Exs. 1005, 1008 (north is up).

Along the right side of northbound Brand there are diagonal parking spaces. Tr. at 62:12–17; Exs. 1005, 1006, 1008. The Court finds that there were cars parked in those spaces at the time of the accident. *See* Tr. at 67:18–68:3 (Hovhannesian's testimony); Ex. 3-14 (police image).[7] The right-most lane is not a dedicated right turn lane—cars in that lane can either cross the intersection and continue northbound on Brand or turn right onto Lexington. Tr. at 295:22–24. It widens from 16' to 21' after those parking spaces end, and then further widens to 23' near the intersection. *Id.* at 62:12–17, 63:13–21, 293:17–294:24; Ex. 1008.

Avoyan was driving a 2015 Ford Fusion, which weighs approximately 3,600 pounds. Tr. at 325:13–20. Hovhannesian was driving a USPS Morgon Olson "two-ton" delivery truck. *Id.* at 52:6–10, 297:7–12. The USPS truck weighs 8,125 pounds "empty with a driver in the driver's seat." *Id.* at 325:13–17, 326:13–15. At the time of the collision, there were "a lot of outgoing packages" in "the back of the truck," so it likely weighed even more. *Id.* at 88:7–12; *see also id.* at 326:21–327:4 (suggesting that the "two tons" in its name refers to the maximum cargo capacity of the truck).

Both Hovhannesian and Avoyan were driving northbound on Brand Boulevard in the right-most lane, intending to turn right onto Lexington Drive. Tr. at 52:6–10, 59:11–14, 60:8–14, 78:12–15 (Hovhannesian); *id.* at 232:18–25, 235:12–16 (Plaintiff). This was "part of [Hovhannesian's] regular route." *Id.* at 59:11–14, 60:8–14, 78:12–15. Plaintiff was "go[ing] to Eagle Rock" to complete a food delivery, and was using a "GPS navigation system on [his] phone," which was "mounted on a stand on [his] air-conditioning vent" on his right. *Id.* at 231:20–22; 232:4–5, 18–19; 235:4–6; 269:23–270:10.

Hovhannesian arrived at the intersection first. Tr. at 232:18–20; 270:11–13. He came to a complete stop at the red light. *Id.* at 64:12–15, 78:22–24; 89:23–90:12. The Court finds that

---

[7] Plaintiff testified that there were no cars in the parking spaces. Tr. at 237:11–25. As already explained, the Court generally finds Plaintiff less credible than Hovhannesian. *Supra* Part IV.B. As to this specific issue, the Court also notes that Hovhannesian's testimony is more reasonable in light of all of the evidence that this was a busy intersection with many shops and restaurants, at a busy time of year and a busy time of day. *See* Tr. at 57:20–59:10, 64:25–65:19; 81:8–14.

8

Hovhannesian's USPS truck was the first vehicle stopped at the intersection; it was not stopped behind other vehicles. *Id.* at 235:8–16 (Plaintiff's testimony).[8] Hovhannesian intended to turn right. *Id.* at 52:6–10, 59:11–14, 60:8–14, 78:12–15. Due to the large dimensions of his vehicle, the presence of an illegally-parked car on Lexington immediately after his planned right turn, and the presence of pedestrians standing "real close to the edge of the curb," Hovhannesian did not position the USPS truck immediately next to the curb on his right. *Id.* at 47:3–9, 48:6–49:18, 64:7–23, 66:2–8, 66:25–67:14, 81:8–22. Instead, it was positioned in such a way that an entire other vehicle could fit between the USPS truck and the curb. *Id.* at 49:3–18, 234:24–235:3, Ex. 3-9–10, 3-12–13, 3-17–18; Ex. 1020. The Court finds that Hovhannesian indicated his intention to turn right with his right turn signal. Tr. at 78:25–79:14 (Hovhannesian's testimony).[9]

When Avoyan arrived at the intersection, also intending to make a right turn, he positioned his vehicle to the right of the USPS vehicle and was stopped at the red light for some time. Tr. at 234:15–235:3, 235:12–19.

Hovhannesian checked his mirrors while he was stopped, and then again as he started to move in preparation for his turn. Tr. at 79:2–81:7. He claims that his truck has no blind spots, and that he never saw Plaintiff's vehicle in his mirrors. *Id.* at 76:25–77:4, 80:12–18.

---

[8] *Contra* Tr. at 43:10–13, 49:16–18, 64:7–15, 67:6–10, 78:16–21, 79:22–80:3 (Hovhannesian's testimony). Although the Court generally finds Hovhannesian credible, the Court discredits his testimony on this particular issue as unreasonable and inconsistent in light of all of the evidence. The police photos show the final points of rest for the two vehicles after their collision as the crosswalk across Brand. Ex. 3-9–19; *see also* Ex. 1020. And the defense accident reconstruction expert, Ian Miller, concluded that Hovhannesian's USPS truck was moving approximately 7 miles per hour at impact while Plaintiff's Ford Fusion was stopped or moving slowly at impact. Tr. at 312:8–23. This seems inconsistent with Hovhannesian's theory that, once the traffic in front of him started moving, he moved forward and to the right to make his right turn and Plaintiff's vehicle, which was initially behind him, snuck to his right side and caused the collision. *Id.* at 45:20–46:16; 79:22–80:3. If that version is credited, it seems unlikely that the Ford Fusion would have been stopped or only moving slowly just before impact. It is more likely that both Hovhanessian and Plaintiff were starting from a complete stop because they were both the first vehicles in line at the intersection.

[9] *Contra* Tr. at 234:15–23 (Plaintiff's testimony). As discussed *supra* Part IV.B, the Court overall considers Hovhannesian more credible, including on this issue.

9

When the light turned green, the vehicles started to move.  Tr. at 232:23–25, 271:12–13.  Hovhannesian began making a right turn with the USPS truck.  *Id.* at 79:22–80:1.  Hovhannesian's vehicle hit Avoyan's in a same-direction sideswipe.  *Id.* at 79:22–80:3, 232:23–25, 271:12–13, 303:12–304:3, 305:5–13, 356:12–25; Ex. 3-3 ("Azad [Hovhannesian] said he made his right turn toward [eastbound] Lexington Dr and collided into Armen [Avoyan]'s vehicle.").  The impact made a "boom" sound of "metal hitting [] metal."  Tr. at 80:16–18, 93:2–4, 321:2–12.  The severity of the impact, quantified as the change in velocity ($\Delta V$ or "delta-v") experienced by Avoyan's Ford Fusion was approximately 2 miles per hour ("mph") or less.  *Id.* at 303:10–18, 305:21–306:23, 307:17–308:25, 319:24–320:2.

### D.  Conclusions of Law

Under the FTCA, the United States may be held liable for the negligent acts of its employees acting within the scope of their employment "in the same manner and to the same extent as a private individual under like circumstances" according to the law of the place where the act or omission occurred.  28 U.S.C. § 1346(b)(1).  The accident here occurred in California, so California law applies.

To establish negligence, Plaintiff must establish: (1) a legal duty to use due care, (2) a breach of that legal duty, and (3) that the breach proximately or legally caused the resulting injury.  *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017).  Plaintiff bears the burden of proving Defendant's negligence by a preponderance of the evidence.  *Ortega v. Kmart Corp.*, 26 Cal. 4th 1200, 1205 (2001).

California is a pure comparative negligence state.  Recovery is not barred just because "the plaintiff's [own] negligent conduct has contributed as a legal cause . . . to [his] harm," even if "the plaintiff is equally . . . or more at fault than the defendant."  *Li v. Yellow Cab Co.*, 13 Cal. 3d 804, 808 (1975); *see also id.* at 827.  Instead, "the damages awarded shall be diminished in proportion to the amount of negligence attributable to the [plaintiff]."  *Id.* at 829.  Defendant bears the burden of establishing plaintiff's comparative fault.  *Pfeifer v. John Crane, Inc.*, 220 Cal. App. 4th 1270, 1285 (2013), *as modified on denial of reh'g* (Nov. 27, 2013).

10

Negligence is presumed when an actor violates a statute, ordinance, or regulation and that violation is a substantial factor in bringing about the harm. Judicial Council of California Civil Jury Instructions ("CACI") No. 418; *Taulbee v. EJ Distribution Corp.*, 35 Cal. App. 5th 590, 596 (2019) (citation omitted). In such cases, the statutes supply the duty and standard of care; all that remains to be proven is causation. *David v. Hernandez*, 226 Cal. App. 4th 578, 584 (2014) (citation omitted). Here, both parties cite to the California Vehicle Code in attempts to establish the other party's negligence. *See* Plaintiff's Opening Post-Trial Brief [Dkt. 74] at 7 (citing Cal. Veh. Code § 22100(a) (right turns)); Defendant's Opening Post-Trial Brief [Dkt. 75] at 6–7 (citing Cal. Veh. Code §§ 21658 (laned roadways), 21750 (overtake and pass to left), 21754–55 (passing on the right)).[10]

The Court first considers whether Plaintiff has established Hovhannesian's negligence. As the Court found the facts, Hovhannesian made a right turn from a position that was not immediately adjacent to the right-hand curb, colliding with Avoyan's vehicle on his right in doing so. *See supra* Section IV.C.

Plaintiff argues that Hovhannesian is presumptively negligent because he violated section 22100(a), which requires that an approach for and a right-hand turn "shall be made as close as practicable to the right-hand curb or edge of the roadway." Plaintiff's Opening Post-Trial Brief at 7. The Court disagrees. Although Hovhannesian's vehicle was not particularly close to the curb, Hovhannesian testified, and the Court finds, that he was *as close as practicable* given the conditions—the size and turning radius of the USPS truck, the number of distracted pedestrians around the intersection, and the parked cars in the way. Tr. at 47:3–9, 48:6–49:18, 64:7–23, 66:2–8, 66:25–67:14, 81:3–22; § 22100(a); *see also Luna v. Tecson*, 227 Cal. App. 2d 655, 658–60 (1964) (explaining that whether violation of this statute requires a finding of negligence or is instead justifiable or excusable depends on whether the person "did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the

---

[10] Within this section, future references to statutory sections are, unless otherwise specified, to the California Vehicle Code.

11

law," and suggesting that the presence of parked cars might justify or excuse not approaching closer to the curb).

Nevertheless, the Court finds that Hovhannesian was negligent. *See* CACI No. 418 (when there is no negligence per se, negligence can still be proven by other means); *Ramirez v. Plough, Inc.*, 6 Cal.4th 539, 548 (1993) ("Where a statute, ordinance or regulation is found to define a standard of conduct for the purposes of negligence actions, . . . the standard defined is normally *a minimum standard*, applicable to the ordinary situations contemplated by the legislation. This legislative or administrative minimum does not prevent a finding that a reasonable [person] would have taken additional precautions where the situation is such as to call for them." (emphasis added)). According to the defense's own accident-reconstruction expert, it was Hovhannesian's moving vehicle that collided with Plaintiff's almost-stationary one, not the other way around. Tr. at 312:8–23. "The failure to use reasonable care in driving a vehicle is negligence." CACI No. 700. "Drivers must keep a lookout for . . . other vehicles" and "must also control the speed and movement of their vehicles." *Id.* That a driver has the right of way does not absolve him of the duty to exercise ordinary care—he "must be watchful of the direction in which danger is most likely to be apprehended." *Malone v. Perryman*, 226 Cal. App. 2d 227, 234 (1964). Hovhannesian testified that his truck has no blind spots and that he checked his mirrors multiple times and never saw Avoyan's car to his right until after the collision. Tr. at 76:25–77:4, 79:2–81:7. But this Court has found that Avoyan's car was in fact stopped to Hovhannesian's right at the red light for some time. *See supra* Section IV.C. "When there is evidence to the effect that one did look but did not see that which was in plain sight, it follows either that some part of such evidence is untrue or that the person was negligently inattentive." *Daun v. Truax*, 56 Cal. 2d 647, 651 (1961). Hovhannesian's negligence was a substantial factor in causing the accident and any of the harm to Plaintiff that resulted therefrom. *See* CACI No. 430; *infra* Part V.

The Court next turns to whether Plaintiff was also negligent. Defendant argues Plaintiff violated four provisions of the Vehicle Code. *See* Defendant's Opening Post-Trial Brief at 6–7 (citing §§ 21658, 21750, 21754–55). The Court addresses each in turn, and concludes that Plaintiff violated only one of these statutes, section 21755, regarding passing on the right.

12

Section 21658 provides: "Whenever any roadway has been divided into two or more clearly marked lanes for traffic in one direction, . . . [a] vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from the lane until such movement can be made with reasonable safety." Although Defendant attempts to characterize this as a requirement of only "one vehicle per lane," *see* Tr. at 253:5–7; Brief at 6, that is not what the statute says. The statute requires a car to drive in one lane at a time, and prohibits unsafe lane changes.[11] Plaintiff, whose vehicle was within the right-most lane at all relevant times, did not violate that requirement.

Section 21750 provides that drivers should generally overtake and pass to the left, "at a safe distance without interfering with the safe operation of the overtaken vehicle, subject to the limitations and exceptions set forth below." Even if Avoyan's positioning to the right of the USPS truck could properly be characterized as an attempt to *overtake* or *pass*, this statute does not in all instances forbid doing so to the right; it is explicitly subject to the following more specific provisions regarding when it is permissible to do so.

Section 21754 provides that a driver may "overtake and pass to the right" "[u]pon a highway within a business or residence district with unobstructed pavement of sufficient width for two or more lines of moving vehicles in the direction of travel." § 21754(c). The right-hand lane on Brand Boulevard, which was 23 feet wide near the intersection with Lexington Drive—twice as wide as the other northbound lanes—appears to satisfy this requirement. Tr. at 293:10–295:21; Ex. 1008.

---

[11] *See, e.g.*, *In re Dennis B.*, 18 Cal. 3d 687, 690–91 & n.1 (1976) (defendant was found guilty of making an unsafe lane change in violation of Vehicle Code section 21658, subdivision (a)); *Weaver v. U.S. Dep't of Agric.*, No. CV 10-1523 RSWL, 2013 WL 1414586, at *6 (E.D. Cal. Apr. 8, 2013) ("The Court finds that it was not reasonably safe for Ryan to change lanes, and that he violated California Vehicle Code § 21658(a)."); *Gammage v. City of San Francisco*, No. 18-CV-05604-JCS, 2020 WL 1904498, at *7 (N.D. Cal. Apr. 17, 2020) ("Defendants assert that . . . officers had probable cause to believe that Gammage had violated California Vehicle Code section 21658(a) (unsafe lane change) based on his two abrupt lane changes within a one–block stretch"); *Urata v. United States*, No. 12CV1277 WQH WMC, 2012 WL 6553503, at *1 (S.D. Cal. Dec. 13, 2012) ("Plaintiff alleged that . . . Munoz . . . 'violated California Vehicle Code section 21658(a) for making an unsafe movement (lane change)'").

13

Finally, section 21755 provides that a driver may "overtake and pass" to the right "only under conditions permitting that movement in safety. In no event shall that movement be made by driving off the paved or main-traveled portion of the roadway." Given its earlier factual findings, the Court finds that Avoyan violated this provision of the vehicle code. It is *not* safe to position oneself to the right of a vehicle that, through its turn signal, has indicated it intends to turn right. *See Valdez v. United States*, 326 F.2d 598, 599 (9th Cir. 1963) (holding not clearly erroneous the court's finding that appellant was negligent when there was evidence that the government driver had, "by a turn indicator, . . . given adequate notice of his intention to turn right; that he commenced the turn in the right-hand lane of a three-lane highway, some six to ten feet from the curb"; and that appellant was "overtaking the government car on its right"). This is even more so when the vehicle is large, and thus can be assumed to have both a wide turning radius and a significant blind spot. And Avoyan's violation of this statute was a substantial factor in bringing about his harm—had he not been in this unsafe position to the right of the USPS truck, he would not have been hit when the USPS driver turned right. This accident is exactly the kind of harm section 21755 was designed to prevent, and drivers are part of the class of persons for whose protection it was adopted. Cal. Evid. § 669(a)(3)–(4). Avoyan's violation of this section thus establishes his negligence in this case. *See Mack v. Valley Motor Lines, Inc.*, 191 Cal. App. 2d 38, 42 (1961) ("It is the general rule that conduct in violation of the Vehicle Code is negligence as a matter of law."); *Hickson v. Beitel*, 103 Cal. App. 2d 391, 394 (1951) ("In view of the fact that evidence in the instant case disclosed that defendant Jimmie Beitel passed another car on his right which was stopped at the intersection and an accident immediately ensued, the jury was properly advised of [a section of the Vehicle Code, which included language identical to the current section 21755]; also that violation thereof was negligence per se . . . .").

As to the apportionment of fault, the preponderance of the evidence demonstrates that Hovhannesian and Avoyan's negligence contributed in approximately equal measure to Avoyan's injuries. As such, the Court apportions fault equally between the parties.

14

## V.    DAMAGES

### A.  Trial Testimony

Avoyan testified that the sides and fronts of his car, including the front tires and wheels, sustained damage. Tr. at 238:15–23. His car had to be towed away from the scene. *Id.* at 240:24–241:4. The car was eventually declared useless and a total loss because the cost of repair was very high in comparison to its value. *Id.* at 238:15–23, 241:5–6. As a result, Plaintiff paid $1,778 to rent a car from Hertz Rent-a-Car for roughly two months. *Id.* at 241:17–242:7, 243:2–9; Ex. 2. He was then without a vehicle for another two months, until he was able to purchase another vehicle. Tr. at 243:8–12. In those two months, he testified that he could not drive for Doordash, Postmates, or Uber, from which he generally earned $5,000 or $6,000 per month. *Id.* at 243:13–244:8; *see also id.* at 235:4–7, 269:23–270:1.

As to his injuries, Plaintiff testified that he was pain-free the day before the collision. Tr. at 246:18–20. Three days after the collision, Plaintiff presented to Dr. Jon Postajian, a chiropractor, with back, neck, and shoulder pain. *Id.* at 244:9–12. Plaintiff received chiropractic treatment from Dr. Postajian multiple times weekly over seven months. *Id.* at 244:23–245:2. Plaintiff was billed $9,075 for these services—a sum he has not yet paid and still owes. *Id.* at 247:13–248:23; Ex. 5. When his condition did not fully resolve, Dr. Postajian referred Plaintiff to Dr. Lawrence Miller for injections. Tr. at 245:6–23. Dr. Miller performed two injections on Plaintiff, who testified that he experienced significant improvement in his pain levels after the second injection, dropping from 10/10 to much more manageable levels. *Id.* at 245:24–246:12. Plaintiff testified that he owes $7,424 to Dr. Miller. *Id.* at 248:24–249:7; Ex. 7.

Dr. Jon Postajian, DC, a chiropractor, testified as one of Plaintiff's treating physicians. Tr. at 103:25–104:12, 113:2–12. He first saw Avoyan three days after the accident. *Id.* at 97:24–98:3, 275:16–25. Avoyan complained of headaches, neck pain, pain in his upper, mid, and lower back, and bilateral shoulder pain. *Id.* at 100:19–24. Dr. Postajian's examination documented certain objective findings, including a positive foraminal compression test with pain and a shoulder depression test. *Id.* at 452:15–21. His records do not reflect any suspicion of malingering. *Id.* at 476:17–19. Dr. Postajian did not review any of Avoyan's medical records or imaging. *Id.* at

15

117:20–118:19.  His report listed a number of diagnoses pulled from the radiologist's report of the 2021 MRIs; Dr. Postajian was otherwise not qualified to make them.  *Id.* at 118:20–22, 119:19–120:6, 122:13–20, 133:25–134:3, 136:1–8.  Over the course of seven months—between December 14, 2020 and July 13, 2021—Avoyan had about 40 chiropractic therapy sessions with Dr. Postajian.  *Id.* at 102:8–11, 123:8–17, 452:8–14; Ex. 5-1.  Dr. Postajian testified that this treatment was medically necessary.  Tr. at 107:2–4.  Because Avoyan was still reporting some residual discomfort, Dr. Postajian recommended that he get MRI scans and referred him to a pain management specialist.  *Id.* at 105:2–18, 115:25–116:4, 156:2–6, 245:3–13.

Dr. Lawrence Miller, a pain medicine physician, both treated and testified as an expert for Plaintiff.  Tr. at 146:13–18, 156:10–20, 178:24–179:2.  He first saw Avoyan in April 2021.  *Id.* at 179:19–20.  Dr. Miller examined Avoyan and found that he had positive right Lasegue, positive right Bowstring, and positive right straight leg raise tests.[12]  *Id.* at 167:2–13.  He did not have any sense that Avoyan was malingering.  *Id.* at 168:8–14.  He also examined Plaintiff's 2021 MRIs, but he did not review any of Avoyan's medical records or imaging from before the accident.  *Id.* at 144:24–145:2, 156:2–8, 192:14–24.  Dr. Miller diagnosed Plaintiff with left cervical radiculopathy, right lumbar radiculopathy, multilevel cervical and lumbar disc protrusions, cervical and lumbar central canal stenosis, lumbar neural foraminal stenosis, and posttraumatic cervical and lumbosacral spine injury.  *Id.* at 207:23–208:17.  Dr. Miller recognized that Avoyan had "a history of prior back pain and degenerative changes."  *Id.* at 157:25–158:1; *see also id.* at 146:2–5.  However, based on Plaintiff's experience of no pain before the accident, pain afterwards, and less pain after treatment, Dr. Miller concluded that Avoyan's preexisting conditions were aggravated by and his pain was caused by the accident.  *Id.* at 157:17–158:2, 192:25–194:8, 195:1–9; *see also id.* at 146:6–147:5.  Dr. Miller gave Plaintiff two epidural injections at the L5-S1 levels on April 29, 2021 and June 1,

---

[12] The straight leg raise is a test in which a physician raises one of a patient's legs such that it pulls on the sciatic nerve to determine if they feel pain.  Tr. at 167:24–168:6, 397:5–13, 485:18–487:3.  Lasegue is a straight leg raise test performed laying down instead of seated.  *Id.* at 461:8–13.  The Bowstring is another tension sign.  *Id.* at 461:8–15.

16

2021. *Id.* at 246:1–12. He opined that these two injections were medically necessary. *Id.* at 206:4–9. Plaintiff's pain levels significantly improved after these injections. *Id.* at 246:1–12.

Dr. Miller also opined that the charges for his services, for anesthesiologist services and the surgery center associated with the epidural, and for the MRIs were reasonable and customary in the geographic area. *Id.* at 170:1–171:21, 172:14–174:8, 174:24–175:19, 176:16–177:15.

Dr. Brian Rudin, an orthopedic surgeon, testified as an expert for the defense. Tr. at 391:2–5. He examined Plaintiff in May 2025. *Id.* at 387:23–388:2; *see also* Ex. 1067 (Rudin's expert report). He testified that, in that examination, Plaintiff was malingering a bit—faking or exaggerating symptoms. Tr. at 391:18–19, 392:19–395:2, 474:12–20, 476:24–479:15. Dr. Rudin also reviewed Plaintiff's medical records and imaging, from both before the December 2020 accident and afterwards. *Id.* at 392:20–24. He testified credibly and persuasively that Avoyan has a number of degenerative conditions unrelated to the accident. He showed how many of these conditions (or signs associated with them) were visible on X-rays from 2019, before the accident; how many appeared similar in 2021 and 2023 MRIs; and explained that they are not acute and related to the accident. Dr. Rudin concluded that Plaintiff suffered at most a minor sprain or strain injury as a result of the accident, for which appropriate treatment would have been at most 12 chiropractic therapy sessions. *Id.* at 445:13–16, 448:6–449:4. Dr. Rudin explained that epidural injections are for pressure on the nerves and nerve pain, and Avoyan had no pressure on his nerves, and in any case it was not related to the December 2020 accident. *Id.* at 446:18–447:7.

Dr. Allen Yu, who has a Ph.D. in biomedical engineering, testified as the United States' biomechanics expert. Tr. at 343:6–344:1, 347:3–8. He relied on Miller's accident reconstruction opinions and compared it to biomechanics literature. *Id.* at 347:13–22, 353:16–20, 364:11–15, 367:25–368:3. Dr. Yu testified that the forces of the accident would have caused Avoyan to move to the left and rear inside his vehicle, and that his movement to the right was voluntary and shows that the forces were actually rather minor. *Id.* at 349:12–21, 350:21–353:10. Dr. Yu also opined that the forces experienced by Plaintiff during this accident are not consistent with his diagnosed structural injuries. *Id.* at 349:22–350:13. Rather, Dr. Yu testified, the forces that Avoyan was exposed to during the sideswipe collision are consistent with being non-injurious or associated with soft tissue

17

injuries such as soreness. *Id.* at 350:14–18. Dr. Yu reached this conclusion in reliance on two studies, Rodowicz 2011 and Bonugli 2021, which replicated sideswipe collisions very similar to the December 11, 2020 accident. *Id.* at 353:16–355:6, 357:13–4, 359:3–17. The Rodowicz study measured "a 2-mile-per-hour sideswipe with the truck moving at 7 miles per hour," "pretty much bang on with" this case. *Id.* at 354:13–18. And the Bonugli study measured a "more severe" accident—a "3 miles per hour delta-v" accident between a "Dodge sedan" similar to Plaintiff's vehicle and a "40,000 to 50,000 pounds" "big rig truck"—with similar "alignment" and damage. *Id.* at 354:19–355:6. In both studies, researchers put sensors on a crash test dummy (Rodowicz) or a volunteer (Bonugli) and "measure[d] the forces and the accelerations" experienced by the occupant of the smaller vehicle. *Id.* at 353:22–354:1. Researchers then compared the measured forces to the "injury assessment reference values," which are used to identify a threshold beyond which forces become "injurious." *Id.* at 354:2–5; 384:23–385:25. Both studies found "that the forces [experienced by the vehicle occupants] [we]re well below"—1 to 5% of—the injury assessment reference values." *Id.* at 354:2–7, 385:22–386:3. Neither study found "any forces that would be consistent with causing structural damage to" a person's cervical and lumbar spine or head. *Id.* at 353:13–354:9. Instead, the measured forces were comparable to those of daily living—akin to the force experienced by "someone standing and bending forward and standing and bending backwards" or "sneezing" or "sitting down into a chair." *Id.* at 355:12–23, 358:9–25. The only injuries identified were from the more severe collisions in the Bonugli study—even there, most people "were not injured at all" and only five reported "a little bit of soreness" the next day, which "resolved." *Id.* at 360:13–21.

Finally, Lindsay Knutson, a Director in the Health Analytics Practice at Berkley Research Group, testified as an expert for the defense regarding the reasonable value of the medical services Avoyan received. Tr. at 489:18–493:7. She uses payer and provider data sets, government benchmarking data, and industry studies and surveys to determine reasonable rates of reimbursement for healthcare services. *Id.* at 490:4–11, 493:10–19, 498:16–499:10. Knutson testified that the reasonable value of health services is "the amount that a willing buyer would pay and a willing seller would accept in an arm's length transaction." *Id.* at 493:20–24. Her basic methodology for

18

calculating such values is (1) to look at the medical bills to identify the service provided, the length of time involved, the date and the location, (2) to get the Medicare benchmark rate determined by the Department of Health and Human Services, which is based on the type of medical service and geographically adjusted at the county level, and then (3) adjust that by the average ratio between physician services as actually paid and the benchmark rate based on surveys and studies. *Id.* at 498:16–499:10, 503:15–506:12, 506:21–507:3, 509:20–25, 510:21–511:5, 511:11–512:25, 513:12–514:9. Knutson found that the reasonable value of the medical services Plaintiff received was as follows:

| Provider | Reasonable Value |
| --- | --- |
| Jon M. Postajian DC | $7,827.60 |
| Tip Top Anesthesia Group | $1,168.44 |
| Lawrence Miller | $1,044.37 |
| Beverly Oaks Surgery Center | $1,486.09 |
| Glenoaks Imaging Professionals | $963.73 |

*Id.* at 501:5–502:11. These rates are higher than the Medicare and worker's compensation rates. *Id.* at 515:15–516:17. She explained that Plaintiff's eligibility for Medicare, health insurance (or lack thereof), or the fact that he was treated on a lien basis does not affect her analysis. *Id.* at 519:3–25.

### B. Credibility and Weight

The Court finds the testimony of Dr. Postajian, Dr. Miller, Dr. Rudin, Dr. Yu, and Knutson to be credible and forthright with reasonable and supported conclusions.

However, as between Drs. Postajian and Miller and Dr. Rudin, only Dr. Rudin had reviewed Plaintiff's medical imaging and records from before the December 2020 accident. Tr. at 117:20–118:19 (Dr. Postajian); *id.* at 144:24–145:2, 156:2–8, 192:14–24 (Dr. Miller); *id.* at 392:20–24 (Dr. Rudin). Dr. Rudin's testimony carefully discussed and explained how his conclusions followed from the imaging, and Plaintiff failed to rebut that testimony. Dr. Rudin also noted that Dr. Postajian's and Dr. Miller's examinations documented some inconsistent results. *Id.* at 485:11–17; *see Urias v. United States*, No. 22-cv-1680-KK-PVCX, 2024 WL 2132510, at *9 (C.D. Cal. May 13,

19

2024) ("However, the Court notes that to the extent some doctors received inconsistent reports of symptoms from Plaintiff, the Court has considered these facts in assessing the reliability of their analyses and conclusions."). Dr. Postajian was not qualified as a medical expert. Tr. at 103:25–104:8, 113:2–12. The Court thus generally gives more weight to Dr. Rudin's testimony than to Dr. Postajian's and Dr. Miller's.[13]

The Court generally finds Knutson's methodology for evaluating the reasonable value of medical expenses to be more reliable than Dr. Miller's. *See Urias*, 2024 WL 2132510, at *12 (adopting Knutson's methodology); *Pedroza v. United States*, No. ED-20-cv-00131CJC-KKx, 2021 WL 4441974, at *9–10 (C.D. Cal. Sept. 27, 2021) (same). Dr. Miller determined a "reasonable" and "customary" charge based on the bills he has encountered over the course of his career treating patients in the community. Tr. at 202:4–25. He does not maintain any type of repository of bills from which to determine a median amount; it is based only on what he can recall. *Id.* Dr. Miller had no specific objections to Knutson's methodology. *Id.* at 203:1–16.[14] Knutson, on the other hand, determined the Medicare benchmark rate for the service provided at a certain date and time, and then adjusted it to reflect what commercial payors generally pay for such services. *Id.* at 498:16–499:10, 503:15–506:12, 506:21–507:3, 509:20–25, 510:21–511:5, 511:11–512:25, 513:12–514:9.[15]

---

[13] The Court also notes that both Dr. Postajian and Dr. Miller have liens on any recovery in this lawsuit; whether and how much they are paid for their services might depend on the outcome of this case. Tr. at 131:5–132:4 (Dr. Postajian); *id.* at 181:1–15, 185:3–4, 19–20, 201:10–18 (Dr. Miller). Though this is a permissible arrangement under California law, *see Pebley v. Santa Clara Organics, LLC*, 22 Cal. App. 5th 1266, 1276–77 (2018), the Court may consider it in assessing the credibility and weight of these doctors' testimony. *See* Order Re: Motions in Limine [Dkt. 58] at 5; *Ruiz v. Walmart Inc.*, No. 20-cv-01129-RAO, 2021 WL 5759043, at *4 (C.D. Cal. Oct. 28, 2021).

[14] Dr. Miller's only objection to Knutson's methodology is that her final numbers regarding his epidural services are too low, or economically impossible. Tr. at 177:17–178:13. As discussed *infra* Sections V.C–D, because the Court finds that the epidural injections were not medically necessary, the Court need not reach the evidence and arguments regarding the proper valuation of those services.

[15] Plaintiff's other argument—that Knutson's methodology is flawed because she accepted almost all of the chiropractic charges while dramatically reducing the epidural-related services, Plaintiff's Opening Post-Trial Brief at 19—is unpersuasive. To the contrary, this shows that her methodology

20

The Court finds, however, that Knutson's methodology does raise some methodological concerns. The Rand Corporation study she uses to determine the ratio between the Medicare benchmark and what providers actually collect (and so the reasonable value of the service) is based on commercial, private payors, not uninsured ones. Tr. at 506:13–507:3. Knutson explained that uninsured payors generally pay less than or equal to commercial payors—for this proposition, she relied on a study of *hospitals* (not all healthcare providers) that found that hospitals collect 25–30% of their *charges* from commercial payors and only 13% of their charges from all other payors, including uninsured ones. *Id.* at 507:4–509:13. But simply because a hospital collects a greater percentage of its charge from a commercial payor does not mean that it collects more money from a commercial payor—suppose, for example, that it has negotiated lower charged rates for certain commercial payors. Avoyan sought care from private providers on a lien basis. *See id.* at 248:21–23. Knutson's methodology is thus not 100% applicable to determine the reasonable value of his medical care in this market.

## C. Findings of Fact

The sides and fronts of Avoyan's car sustained damage. Tr. at 238:15–23, 336:10–337:2, 380:2–13. The left front tire was punctured and displaced from the rim and the right front tire ended up on the 6-inch curb. *Id.* at 323:24–324:8, 327:17–329:10; Exs. 3-9, 3-18. Avoyan's car had to be towed away from the scene. Tr. at 240:24–241:4. The car was eventually declared useless and a total loss because the cost of repair was very high in comparison to its value. *Id.* at 238:15–23, 241:5–6, 333:2–5, 370:20–25.

As a result, Plaintiff rented a vehicle from Hertz Rent-a-Car—he paid $1,778 to rent a car for roughly two months. Tr. at 241:17–242:7, 243:2–9. He was without a vehicle for another two months. *Id.* at 243:8–12. During that latter period, he could not drive for Doordash, Postmates, or

is more sophisticated than an across-the-board reduction. Plaintiff's contention that workers' compensation rates exceed Knutson's reasonable value calculations, and that she answered only what Medicare would pay for these services, Plaintiff's Opening Post-Trial Brief at 19, simply mischaracterizes her testimony.

21

Uber. *Id.* at 243:13–15; *see also id.* at 235:4–7, 269:23–270:1. The Court finds that Plaintiff generally earned $5,000 or $6,000 per month from such work. *Id.* at 243:16–244:8.

Plaintiff, who was a smoker in his late fifties who had been in several previous car accidents, already had a number of medical conditions on the date of the accident. Tr. at 19:5–7, 158:12–160:9, 161:15–162:14, 246:13–17, 251:16–252:1, 395:3–18, 396:17–397:17, 458:25–459:12; Exs. 5, 9-2, 11, 13. The Court finds that Plaintiff has a number of degenerative conditions not connected to the December 2020 accident. First, Plaintiff has diffuse idiopathic skeletal hyperostosis ("DISH"). Tr. at 398:2–12, 398:23–399:3. Avoyan's DISH was visible on 2019 X-rays and diagnosed in 2019. *Id.* at 398:10–14. Second, Plaintiff also suffers from chronic degenerative disc disease, which is when the discs—which are like "cushions" between bones—"wear out," "shrink down," and "blob out." *Id.* at 391:8–10, 399:13–18. When degenerative disc disease is "advanced," or has "been there a while," bone spurs tend to form around it. *Id.* at 399:4–25. Avoyan's March 2021 MRIs revealed significant disk bulging without signs of acute trauma in the same spots that the 2019 X-rays revealed bone spurs,[16] indicating that he had been suffering from chronic degenerative disc disease for some time before the 2020 accident. *Id.* at 411:4–425:9, 454:10–456:20. Third, Avoyan has concentric annular tears or fissures. *Id.* at 400:6–402:11, 405:6–15, 407:13–19, 408:22–409:5. This kind of annular tear (as opposed to a radial or transverse tear) is degenerative, very common with degenerative disc disease, and very uncommon from trauma. *Id.* at 400:17–21, 401:15–20.[17] Fourth, Avoyan had very mild foraminal stenosis, which is narrowing or tightness where the nerves come out of the side of the spine. *Id.* at 425:10–23, 426:12–14, 428:5–434:25. Avoyan had mild central canal stenosis at C5-6. *Id.* at 436:16–24, *see also id.* at 425:16–19. This stenosis was caused

---

[16] Bone spurs are visible on an X-ray, but disc bulges are only visible on an MRI, and the first MRIs available in this case are from March 2021. Tr. at 454:10–13, 454:24–455:11.

[17] Dr. Miller recognized that annular tears can be either acute or degenerative. Tr. at 145:11–21, 146:2–5, 199:25–200:5. He did not specifically opine as to the *type* of annular tear that Plaintiff had and whether it was acute. *See id.* The Court thus credits Dr. Rudin's more specific testimony over Dr. Miller's more general and ambivalent testimony on this point.

22

by his bone spurs, chronic disc bulge, and arthritis of the facet joints, all of which "take a long time to develop." *Id.* at 426:14–20, 437:4–13. Finally, Avoyan had endplate edema at L2-3. *Id.* at 437:16–438:22. This edema "look[ed] exactly the same" in the 2021 and 2023 MRIs, rather than "wan[ing]" and "disappear[ing]" as the trauma passes—it is a "chronic degenerative change" from a "bone spur that[ has] been there for some time." *Id.* at 441:14–442:5.

Despite these conditions, Avoyan was not experiencing any pain on December 10, 2020. Tr. at 246:18–20, 99:25–100:15; *see also id.* at 147:6–18, 459:17–20, 483:21–24.[18]

During the accident, Plaintiff, who was wearing his seat belt, moved to the right inside his vehicle. Tr. at 250:25–251:2, 272:21–24. This movement was not due to the force of the impact, but to Plaintiff attempting to brace himself. *Id.* at 250:25–251:2, 272:21–273:3; *see also id.* at 349:10–21, 351:19–353:10. None of his left shoulder, left arm, and his head made contact with the inside of his car. *Id.* at 273:8–274:6.

Avoyan did not seek medical attention immediately after the accident. Tr. at 274:15–275:15. He first experienced pain when he went home that night. *Id.* at 251:3–6. The next morning, his pain was worse; he still did not seek medical care. *Id.*; *id.* at 275:16–20. He did not seek medical care on December 13 either. *Id.* at 275:23–25.

Avoyan first saw a chiropractor—Dr. Postajian—three days after the accident. Tr. at 97:24–98:3, 275:16–25. Avoyan complained of headaches, neck pain, pain in his upper, mid, and lower back, and bilateral shoulder pain. *Id.* at 100:19–24. Over the course of seven months—between December 14, 2020 and July 13, 2021—Avoyan had about 40 chiropractic therapy sessions with Dr. Postajian. *Id.* at 102:8–11, 123:8–17, 452:8–14; Ex. 5-1. The Court finds that all of these

---

[18] The Court credits Plaintiff's testimony on this subjective point. The defense attempts to rebut it by identifying previous diagnoses and chiropractic notes that reveal pain as late as April 1, 2020. Defendant's Opening Post-Trial Brief at 12–13. But six months passed between the latest pre-accident medical records and the accident. And the defense's insistence that Plaintiff's testimony established only that his previous pain was only "basically gone," *id.* at 13 (citing Tr. at 246:13–17), ignores the immediately following question and answer: "Q. So, say, a day before this accident, were you experiencing any back or neck pain? A. No." Tr. at 246:18–20.

23

chiropractic therapy sessions were medically necessary and caused by the accident. *See* Tr. at 107:2–4 (Dr. Postajian testified that this treatment was medically necessary); *id.* at 476:17–19 (Dr. Postajian did not document any malingering); *id.* at 157:17–158:2, 193:14–194:6, 195:1–5, 217:2–7 (Dr. Miller concluded that Avoyan's preexisting conditions were aggravated by and his pain was caused by the accident); *id.* at 446:1–6, 448:19–22 (Dr. Rudin conceding that some course of chiropractic therapy would be medically necessary).[19]

In March 2021, Plaintiff received MRIs of his cervical and lumbar spine. Tr. at 156:2–8, 176:21–177:4. The Court finds that this diagnostic imaging was medically necessary after the accident. *See id.* at 245:3–5 (Dr. Postajian recommended the MRI scans).[20]

In April 2021, Avoyan went to see Dr. Miller, a pain management specialist. Dr. Miller gave Plaintiff two epidural injections at the L5-S1 levels on April 29, 2021 and June 1, 2021. Tr. at 246:1–12. The Court finds that these epidural injections were *not* medically indicated as a result of the December 11, 2020 accident. *Id.* at 446:18–447:7 (Dr. Rudin explaining that epidural injections are for pressure on the nerves and nerve pain, and Avoyan had no pressure on his nerves, and in any case it was not related to the December 2020 accident).[21]

---

[19] Dr. Rudin opined that only 12 visits of chiropractic therapy were necessary. Tr. at 446:1–6, 448:19–22. He explained that these issues eventually "get better on [their] own," *id.* at 446:13–17, and that "usually . . . after a minor collision, we'll treat folks for . . . up to six weeks, 12 visits of chiropractic therapy and that's it," *id.* at 396:12–16. *See also id.* at 446:4–5 ("Typically a few weeks of physical or chiropractic therapy, maybe 12 visits is adequate for something like this."). This testimony about the "usual[]" or "[t]ypical[]" case for most "folks" suggests that his conclusion on this point did not fully take into account all of Avoyan's preexisting conditions that may have been aggravated by the accident and slowed his recovery. *See id.* at 127:5–9, 162:9–15, 193:7–194:1, 459:8–12, 483:25–484:4.

[20] The defense did not introduce any expert evidence that the MRI scans were not medically necessary. *See generally* Tr. at 387:17–488:25.

[21] *Contra* Tr. at 206:4–9 (Dr. Miller opining that the two injections were medically necessary). As discussed *supra* Section V.B, the Court generally credits Dr. Rudin's testimony over Dr. Miller's.

24

**D.  Conclusions of Law**

Defendant must pay Plaintiff reasonable compensation for the harm it caused him.  *See* CACI No. 3900.  Plaintiff requests $10,000 for the loss of use of his car, $41,099 in past medical expenses, an amount in the Court's discretion for future medical expenses, and an amount of non-economic damages "commensurate with the physical pain suffered and the impairment of Plaintiff's ability to care for his aging parents" in the Court's discretion.  Plaintiffs' Opening Post-Trial Brief at 20, 23.  The Court addresses each item separately.

**1.  Loss of Use**

Plaintiff is permitted to recover damages for the loss of use of his personal property—here, his car.  *See* CACI No. 3903M.  This theory of damages is distinct from the physical damage to the property.  *Compare* CACI No. 3903M *with* CACI No. 3903J (damage to personal property); *see also Reynolds v. Bank of Am. Nat'l T. & S. Ass'n*, 53 Cal. 2d 49, 50–51 (1959) (where a vehicle is damaged or destroyed, the plaintiff may for the damage done to the vehicle *and* also for the loss of being deprived of its use during the time reasonably required for repair or replacement).[22]

The proper measure of such damages is the reasonable cost to rent a similar vehicle for the amount of time reasonably necessary to repair or replace the damaged vehicle.  CACI No. 3903M; 23 Cal. Jur. 3d Damages § 66 (Jan. 2026); *Collin v. Am. Empire Ins. Co.*, 21 Cal. App. 4th 787, 818 (1994) (citation omitted).  Here, it took Avoyan four months to replace his vehicle.  Tr. at 241:17–19, 243:2–12 (two months in which he had a rental, and then an additional two months after that).  He also testified that the rental price of a replacement vehicle was $1,788.60 for two months.  *Id.* at 242:1–243:4.  Thus, the Court concludes that the reasonable compensation for his four-month loss of use of the vehicle is twice that, or $3,577.20.[23]

[22] Plaintiff has already been compensated for the physical damage to his vehicle.  Plaintiff's insurance paid him for the loss of his vehicle and subsequently presented and settled a claim with the USPS for same.  *See* United States' Motion *in Limine* to Exclude Property Damage [Dkt. 49] at 3.

[23] This is less than the amount Plaintiff seeks to recover for his lost earnings as a rideshare and delivery driver.  But loss of use is a distinct category of damages from lost earnings, *compare* CACI

25

### 2. Medical Expenses

"A plaintiff may recover" damages for past medical expenses. *Ochoa v. Dorado*, 228 Cal. App. 4th 120, 134 (2014) (citing *Howell v. Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th 541, 555 (2011)). "Such damages are limited to the lesser of (1) the amount paid or incurred for past medical services, and (2) the reasonable value of the services." *Id.*

The United States is not liable for Avoyan's pre-existing conditions or the natural progression of those conditions. *See, e.g.*, *Whyatt v. Kukura*, 157 Cal. App. 2d 803, 805 (1958). It is liable, however, for damages caused by the collision that are over and above the natural progression of his pre-existing conditions; for the extent that his condition has worsened as a result of the accident. *Sanchez v. Kern Emergency Medical Transportation Corp.*, 8 Cal. App. 5th 146, 168 (2017) (citation omitted).

Plaintiff bears the burden of proving that his past medical care was reasonably required and attributable to the accident. *Foshee v. United States*, No. 8:23-CV-00375-ODW (JDEX), 2025 WL 2879645, at *5 (C.D. Cal. Oct. 9, 2025). As the Court found *supra* Section V.C, Plaintiff has met this burden with respect to his chiropractic therapy with Dr. Postajian and his March 2021 MRIs. He has not, however, met it with respect to the epidural injections, which Dr. Rudin credibly testified were not medically necessary.

In light of its evaluation of Knutson and Dr. Miller's methodology for calculating the reasonable value of medical services, the Court concludes that the midpoint (or average) between Knutson's estimates and the charges actually incurred represents a fair estimate of the reasonable value of these expenses. *See Bermudez v. Ciolek*, 237 Cal. App. 4th 1311, 1330–31 ("[T]he measure of damages for uninsured plaintiffs who have not paid their medical bills will usually turn on a wide-ranging inquiry into the reasonable value of medical services provided . . . ."); *Pebley v. Santa Clara*

No. 3903M *with* CACI No. 3903C (lost earnings), and the reasonable rental value is an appropriate measure of the former. That measure makes sense here—had Plaintiff mitigated his damages by renting a vehicle in the second two months, as he did for the first two months, he would have been able to work as a driver and would not have lost these earnings. *See* CACI No. 3931 (duty to mitigate damages).

26

*Organics, LLC*, 22 Cal. App. 5th 1266, 1278–81 (2018) (where plaintiff presented evidence of billed charges and experts that testified based on their experience that those charges were reasonable and customary and defendants presented their own expert evidence regarding the reasonable value of medical expenses, the fact-finder was entitled to weigh the credibility of battling experts and determine reasonable value).  Thus, the reasonable value of Dr. Postajian's services is $8,451.30, and the reasonable value of the MRIs taken by Glenoaks Imaging Professionals is $2,281.87, for a total of $10,733.17 in expenses for past medical care.

A plaintiff is also entitled to recover the reasonable value of medical care that he is reasonably certain to need in the future as a result of the accident.  *Cuevas v. Contra Costa County*, 11 Cal. App. 5th 163, 183 (2017) (quoting CACI No. 3903A as "an accurate statement of the law").  Avoyan has not met his burden in establishing the need for future medical treatment related to this accident.  He testified that he is no longer in any pain.  Tr. at 276:24–277:2.  And he has been in at least three other car accidents since the 2020 one, from which he has claimed injury for which he has undergone additional medical treatment.  *Id.* at 258:13–24; 259:7–260:4.  Plaintiff has not met his burden to show which of his lingering symptoms (if there are any) are attributable to the 2020 accident as opposed to subsequent ones.

### 3.  Non-Economic Damages

Finally, Plaintiff seeks to recover non-economic damages for his physical pain and suffering, the impairment of his ability to care for his aging father and emotional distress associated with that inability, and the ongoing interference with his daily activities and work.  Plaintiffs' Opening Post-Trial Brief at 22.

In California, a plaintiff may recover reasonable compensation for past and future pain and suffering.  *See Capelouto v. Kaiser Found. Hosps.*, 7 Cal. 3d 889, 892–93 (1972); *Duarte v. Zachariah*, 22 Cal. App. 4th 1652, 1665 (1994); *Hilliard v. A. H. Robins Co.*, 148 Cal. App. 3d 374, 412 (1983).

27

Having considered the evidence Avoyan presented regarding the pain and suffering he experienced, as well as numerous factually analogous cases with past non-economic damages awards,[24] the Court finds that his non-economic damages for pain and suffering are $10,000.00.

For the same reasons that he has not established his entitlement to future medical expenses, Avoyan has also not established his entitlement to future non-economic damages related to the accident.

## VI.    CONCLUSION

The Court finds that Plaintiff proved his claim of negligence, and has established total damages of $24,310.37 = 3,577.20 + 10,733.17 + 10,000.00.  The Court has also found that Plaintiff's negligence contributed in equal measure to his injuries.  Considering the parties' comparative fault, Defendant is liable for 50% of Plaintiff's damages.  The Court therefore awards Plaintiff $12,155.19 in damages.  The Court orders the parties to meet and confer and lodge a proposed final judgment consistent with this Order no later than fourteen days from the date of this Order.

Dated: April 2, 2026

_____
Hernán D. Vera
United States District Judge

_____

[24] *See, e.g., Foshee*, 2025 WL 2879645, at *6 (awarding $25,000 in non-economic damages for minor collision which caused cervical and lumbar soft tissue strain and Plaintiff had a history of degenerative disk disease and chronic bone spurs); *Urias*, 2024 WL 2132510, at *12 (awarding $27,000 in past non-economic damages for two years of physical pain to neck and back and headaches and dizziness following concussion or mild traumatic brain injury attributable to accident); *Seferaj v. United States*, No. 21-cv-6928-DMG-AFMx, 2023 WL 5530026, at *6 (C.D. Cal. Aug. 28, 2023) (awarding $18,000 in non-economic damages for back, neck, and leg pain that had continued several years after an accident where a postal truck struck plaintiff's driver door and injured Plaintiff); *Peltier v. United States*, No. 16-cv-00774-ODW-SPx, 2017 WL 4621544, at *2, 5 (C.D. Cal. Oct. 16, 2017) (awarding $2,500 in non-economic damages for back pain, suffering, and anxiety stemming from minor rear-end collision); *Cantu v. United States*, No. 14-cv-00219-MMM-JCGx, 2015 WL 4720580, at *2–5, 13–15, 36 (C.D. Cal. Aug. 7, 2015) (awarding $15,000 in noneconomic damages for past mild back, neck, and shoulder pain stemming from a moderately severe collision where plaintiff's automobile spun clockwise and rolled onto its roof; plaintiff remained secured in his seat and walked away from the wreckage).

28